# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**THOMAS HAMACHER, IYAIRIS TOLEDO
FUENTES** *AS PARENT OF I.H,* **AND
BAD DOG RACING, INC.,**

**PLAINTIFFS,**

**v.**                                    **Case No.**

**ORLANDO KART CENTER LLC.,**

**DEFENDANT.**

_____/

## COMPLAINT
## DEMAND FOR JURY TRIAL

**COMES NOW**, Thomas Hamacher, Iyairis Toledo Fuentes *as parent of I.H.*, and Bad Dog Racing Inc., by and through the undersigned counsel, files their Complaint against Defendant, Orlando Kart Center LLC ("OKC") for violations of Title III of the Americans with Disabilities Act, 42 U.S.C. 12101 et. seq., and the Florida Civil Rights Act, Fla. Stat. § 760 et seq. Defendant also wrongfully evicted Plaintiffs from the facility, engaged in Tortious Interference, Retaliation and the Intentional Infliction of Emotional Distress.

## JURISDICTION AND VENUE

1.      OKC does business in Florida, and a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred in Orlando, Orange County,

1

Florida, such that venue is proper within the United States District Court for the Middle District of Florida, Orlando Division, pursuant to 28 U.S.C. §§ 1391 (b)(1)-(b)(2).

2.    This Court has jurisdiction over the actions pursuant to 28 U.S.C. §§ 1331, 1343.

**PARTIES**
**THOMAS HAMACHER**

3.    Thomas Hamacher  (Mr. Hamacher) is and was, at all times material hereto, a resident of Hillsborough County, Florida.

4.    Mr. Hamacher is a disabled veteran, who is unable to stand for extended periods of time or walk long distances and is a qualified person with a disability as defined by the Americans with Disabilities Act and the Florida Civil Rights Act.

**IYAIRIS TOLEDO FUENTES *AS PARENT OF  I.H.***

5.    I.H. is  the minor son of Ms. Iyairis Toledo Fuentes (Mrs. Hamacher) and Mr. Hamacher.

6.    I.H. is not disabled but is a companion, as defined pursuant to the ADA, to Mr. Hamacher who has been affected by the Defendant's discriminatory actions.

7.    I.H., is and was, at all times material hereto, a resident of Hillsborough County, Florida.

**BAD DOG RACING INC.**

8.    Bad Dog Racing Inc. (Bad Dog Racing) is a For-Profit corporation doing business in Florida.

9. Bad Dog Racing is the entity used to operate and manage I.H.'s racing efforts. Ms. Iyairis Toledo Fuentes is the president of the corporation.

## DEFENDANT

10. Defendant, Orlando Kart Center (OKC), is a For-Profit corporation located at 10724 Cosmonaut Boulevard, Orlando, Florida.

11. OKC provides all facets of kart racing to include kart rental, garage rental, race hosting, a racetrack, retail store, a racing school and other kart related services. OKC is  a place of public accommodation as defined by Title III of the ADA, 42 U.S.C. §§ 12181(7) (C) (D) (E) (I ) (J) (L).

## MR. HAMACHER'S COMPLIANCE WITH ADMINISTRATIVE PRE-REQUISITES

12. Mr. Hamacher has timely complied with all conditions precedent to jurisdiction under the Florida Civil Rights Act (FCRA) Fla. Stat. § 760.11.

13. Mr. Hamacher filed his charge of discrimination with the Florida Commission on Human Relations (FCHR) on February 18, 2025.

14. Mr. Hamacher's Determination of Reasonable Cause was issued by the FCHR on August 15, 2025, and was received by Mr. Hamacher on August 16, 2025.

## STATEMENT OF FACTS

15. OKC provides an array of services to the public to include renting karts, rental of the track for those who own their karts (like The Plaintiffs),  a racing school, a parts and accessory store, refreshment center, trailer storage and garage rental.

16. OKC is a large facility with a racetrack which is approximately one mile

long. It has a national reputation as a technically compliant racetrack, and it is one of only two (2) tracks in the state of Florida with that type of designation.

17.    OKC is the racetrack closest to Plaintiffs' home, the second track of that caliber is in Homestead, Florida at least four (4) hours away from Plaintiffs' home.

18.    Andre Martins (Mr. Martins) owns and operates OKC. According to OKC's website, Mr. Martins is a very accomplished racer with over twenty-five (25) years' experience with kart racing. He has traveled around the country and his racing teams have won many national championships including Super Karts USA (SKUSA) Super Nationals, and the Rotax championships.

19.    OKC  is the site where many races, including the SKUSA races, are held, and SKUSA races serve as a major steppingstone to professional motor sports. These races attract international talent and prominent and wealthy sponsors.

20.    Kart racing is a very lucrative sport for good racers, like I.H. But to become a real contender racing requires a well-known sponsor or affiliation with a respected racing team like SODI,[1] who develop young racers.

21.    Racers seek sponsors not only to help defray the costs of  purchasing karts,  coaching and access to mechanics to work on the karts, but to invest in an individual racer's career, which is the goal of all serious racers, like I.H.

22.    The kart racing community knows, and OKC advertises, that a minor's presence at OKC provides the exposure to catalyze selection by a sponsor or be

---

[1] SODI is short for Sodikart, a French manufacturer which makes professional racing chassis and high-quality karts.

selected by a scout to advance their driving ambitions.

23.    Kart racing is known to be a feeder sport for NASCAR racing.

24.    Mr. Hamacher is an honorably discharged U.S. Air Force veteran, who receives VA benefits for his service-connected disabilities.

25.    Mr. Hamacher is unable to stand for long periods of time, and for mobility he uses crutches, a wheelchair and upon occasion an electric trike.

26.    I.H. is Mr. Hamacher's minor son, now age nine (9), and is a fourth-generation racer. Following in the footsteps of his great-grandfather and grandfather who raced motorcycles and bicycles, and his father who raced motorcycles and was an avid drag racer.

27.    I.H.'s dream is to be a professional kart racer.

28.    I.H started practicing and racing karts at OKC in 2020 when he was five (5) years old.

29.    The Plaintiffs live in Ruskin Florida, and almost every weekend would load up the truck and the toy hauler [2] and drive to OKC. Plaintiffs normally left directly after I.H. would get out of school on Fridays to race and practice all weekend. When not at OKC, the Plaintiffs were travelling through the state so that I.H. could participate in other races.

30.    Kart racing is a very physical sport, and requires assistance, especially for the minors who race like I.H. The young racers are accompanied by parents or coaches

---

[2] The toy hauler consists of a section for sleeping and eating, and a separate section to store a kart.

who are critical for a racer's success and participation.

31.     Prior to racing or practicing at OKC, the karts need to be prepared and set on the grid. [3] When Plaintiffs first started racing at OKC, due to Mr. Hamacher's disabilities, OKC allowed Mr. Hamacher to drop off his son's equipment near their assigned pit area by way of the Hamacher's truck and toy hauler.

32.     But Mr. Hamacher's disabilities made navigating the facility by truck difficult, and in November 2021 a garage unit was rented from OKC for $400 a month. This allowed Plaintiffs to store the kart and equipment at the facility.

33.     OKC rented the Plaintiffs garage unit 61 which is located approximately one eighth (1/8) of a mile from the entrance of the racetrack. Mr. Hamacher requested one of the available garages, located much closer to the grid, due to his disabilities, but that request was denied.

34.     Neither Mr. Hamacher nor Bad Dog Racing Inc. executed a lease for the garage rental. The only agreement executed was by Mrs. Hamacher, as president of Bad Dog Racing, authorizing bank withdrawals for the garage payment.

35.     To address his mobility issues between garage unit 61 and the racetrack, Mr. Hamacher attempted to use a 500W electric trike to transport himself and items between the garage and the grid.

36.     Mr. Martins objected to the use of the trike on the grid, even though Mr. Hamacher made affirmative requests to use the trike for mobility so he could help I.H.

---

[3] The grid is the area of the racetrack where the kart is seated before a race or practice and where the racers put on their protective gear.

37.     At OKC kart drivers are prohibited from *driving* their karts onto the grid. To get karts on the grid the children must  get out of the karts and push the kart to and from their garages by way of a cart stand. The racing kart alone weighs approximately 225-300 pounds, and at the time I.H. weighed approximately fifty-five  (55) pounds.

38.     Getting the kart on and off the cart stand is dangerous and cannot be safely performed by I.H. Mr. Hamacher, like most of the parents/coaches, wanted to assist his child with this task but could not do so unless he was afforded the use of  his trike or wheelchair on the grid. As a result, other parents/coaches had to help I.H. lower his cart stand.

39.     When Mr. Martins was at OKC,  Mr. Hamacher was forced to do his best to walk on the grid, but it was very painful. Due to his disabilities he had to stop often, walk very slowly and seek help from other parents/coaches. Mr. Hamacher was unable to bend over or push anything heavy and when he had to walk a further distance, he used crutches.

40.     Often I.H. would perform some of the kart preparation by himself because his father was unable to assist. This was embarrassing for Mr. Hamacher and disappointing for I.H.

41.     Upon occasion Vitor Salgado, the manager, would secretly  allow Mr. Hamacher to use the electric trike on the grid when Mr. Martins was not at OKC. Mr. Salgado told the Plaintiffs not to tell Mr. Martins, because if he found out Mr. Salgado would get in trouble.

42.     After the children are lined up at the grid and begin driving, the

parents/coaches immediately go up to a viewing mezzanine to watch the children on the track.

43.     The viewing mezzanine closest to the track, and every other viewing area at OKC, are only accessible by a stairwell. As early as 2020 Mr. Hamacher affirmatively requested access to at least one viewing mezzanine, but the request was denied. He renewed that request every year he used OKC, and every year it was denied.

44.     To watch his son, Mr. Hamacher would sometimes ask parents/coaches to aid him up the stairs. Or he would use his electric trike and later his electric wheelchair, to travel to a different location on the property to watch his son driving on the track.

45.     Those ground level locations did not provide a viewing area commensurate with a second story viewing mezzanine, because the entire track cannot be seen at ground level. Mr. Hamacher also missed the first portion of races/practice when traveling to these other locations.

46.     Even though grid side garages were available, Plaintiffs waited approximately two (2) years to be allowed to rent a grid side garage and were then rented unit 34.

47.     Plaintiffs paid $425.00 per month for garage unit 34 starting in approximately December 2023, which increased to $500.00 in the summer of 2024. As before, no garage rental agreement was executed by the parties.

48.     Plaintiffs spent significant funds modifying their garage unit by adding

air conditioning, shelving, doors, and partitioning the unit into a front and back section. These are typical modifications performed by garage tenants at OKC.

49.    I.H.'s racing skills were remarkable. I.H. had been involved in approximately sixty (60) events in four (4) years, and at least fifteen (15) major races per year, aside from the weekly practice sessions at OKC. I.H. had taken first place many times for his class category.

50.    In January of 2024, I.H. received a personal invitation to race in the February 2024 SKUSA race with the SODI team. An offer made only to premiere racers. This afforded I.H. access to SODI trainers and mechanics and coaches. In March of the same year I.H. qualified tenth (10th) in a SKUSA race with forty of the best racers in the country age 7- 10 years old.

51.    Over time, Mr. Martins imposed further restrictions on the electric tricycle, and as a result, in March 2024 Mr. Hamacher purchased an electric wheelchair to use specifically at OKC.

52.    Mr. Hamacher requested use of the electric wheelchair on the grid to help his son, but OKC denied the request. This required Mr. Hamacher, once near the grid, to get out of his electric wheelchair and either hobble along or use crutches to try to assist his son on the grid. It was painful and ineffective, and required other parents/coaches to always assist I.H.

53.    Mr. Martins was aware of the ongoing danger and difficulty the denial of the accommodation created because he was directly told of the same and saw Mr. Hamacher struggle on the grid.

54.   Mr. Martins always made the environment hostile for the Plaintiffs. Mr. Martins threatened the Plaintiffs that if they kept complaining about ADA access I.H. would be banned from racing at OKC. I.H. would share with his parents the complaints Mr. Martins would lodge about his father.

55.    The Plaintiffs were continuing to spend significant time at OKC, and the hauling and loading/unloading created a terrible strain on Mr. Hamacher.  To make things easier, in March of 2024, the Plaintiffs rented a spot on OKC's dirt lot to park the toy hauler.

56.   The dirt lot rent was $250.00 per month. Like before no lease was signed for the lot rental, only an authorization by Bad Dog Racing to withdraw the rental fees.

57.   Throughout 2024 Mr. Hamacher made written accommodation requests to allow the truck and the toy hauler to be kept inside the OKC paved parking lot during the week.

58.   This accommodation was needed due to the physical strain of transporting the toy hauler and truck to/from the dirt lot each weekend. Other individuals were afforded this option, but OKC denied Plaintiffs' request.

59.   Upon rare occasion the manager, Mr. Salgado, would allow the toy hauler to  remain inside OKC because he knew how difficult it was for Mr. Hamacher to move the trailer and knew how accomplished  a racer I.H. had become.

60.   In October or November of 2024 Victor Salgado is fired. The use of OKC's services become even more hostile for Plaintiffs because of the ongoing

requests for accommodations which were continually denied.

61.    On December 3, 2024, SODI extends another invitation for I.H. to race with their team for the upcoming January 10-12, 2025, SKUSA races being held at OKC. Plaintiffs accept the offer and pay the race entry fee of $1500.00.

62.    Without notice, and having paid the December rent,  on approximately December 5, 2024, OKC announced a prohibition to prepare karts in any leased garages on the grid.

63.    Plaintiffs, who paid the dirt lot rental for December,  are also told the toy hauler must be moved from the dirt lot, but no alternate location is provided.

64.    With only about one month before the SKUSA races, and right before the holidays, Plaintiffs are forced to find another offsite location to prepare the karts and park the toy hauler. This created unsurmountable barriers for Mr. Hamacher's disabilities.

65.    Mr. Hamacher spoke to Mr. Martins and his staff and explained the issues these two edicts created for him as a person with a disability.  Mr. Hamacher requested that, since he could not work on I.H.'s kart in their rented garage, to at least be permitted to park the toy hauler onsite, to avoid the physical strain of  having to keep moving it throughout the weekends.

66.    The request is denied for Mr. Hamacher,  but OKC allows others to park inside.

67.    Mr. Hamacher is told he would need to move his toy hauler from the dirt lot regardless of if the December rental fee was already paid, and in retaliation for his

ongoing protestations, OKC would not provide another location even temporarily due to his disabilities.

68.     Concurrently OKC was still denying the use of the electric wheelchair on the grid and still failed to offer an accessible viewing mezzanine.

69.     On December 21, 2024, Mr. Hamacher is told he must move his truck and toy hauler immediately.  The same day Mr. Hamacher sends a text message to OKC, once again asking for the accommodation to move his toy hauler closer to the track due to his disabilities. OKC denies the request.

70.     Abruptly on December 26, 2024, Plaintiffs receive Termination Notices for the grid side garage, and the toy hauler spot. The notices provide only five (5) days to move everything out by January 1, 2025. This deadline occurred during the holidays and was further complicated by Mr. Hamacher's need for physical help to clear the garage.

71.     In the four (4) years Plaintiffs rented a garage, and in the time the toy hauler lot was rented, rent was never paid late, nor did Plaintiffs ever receive any warnings, written or oral, about "lease" violations.

72.     The termination notices state that Plaintiffs violated the terms of the leases. But leases were never produced, and the pre-paid rent was never returned as a refund to the prohibition on using the grid side garage.

73.     No other family renting a garage grid side received a termination notice.

74.     On information and belief, no other family renting a spot in the dirt lot received a termination notice.

75.    Mr. Hamacher responded to OKC's shocking termination on December 26, 2024, seeking assistance again from OKC. But OKC is adamant that accommodations shall not be provided.

76.    To help him clear the garage Mr. Hamacher hired a person to provide physical assistance but had to leave the AC and the partitions behind because there was not enough time to put the garage back to its original shell, nor can he do it without physical assistance.  Plaintiffs departed the garage on December 27, 2024.

77.    Due to these discriminatory actions and wrongful evictions, I.H. was unable to  participate in the SKUSA Winter Series race starting on January 10, 2025. This was a crushing blow for the young child and Plaintiffs were devasted.

78.    When OKC discriminated against I.H.'s  disabled  father by retaliating against him for seeking reasonable accommodations, it deprived I.H. of the access needed to continue his racing. His racing dreams came to a screeching halt.

79.    I.H. went from being 2024 Orlando Cup Mini class champion to being kicked out, all within a couple of weeks. I.H. lost all the friends he made at OKC, and the comradeship of the sport, and is left with the disappointment of the loss of his racing dream- just because his father is a disabled veteran.

80.    I.H. lost the opportunity to race with SODI  because he no longer races  or practices at OKC, a nationally recognized racetrack. Plaintiffs lost the opportunity to be seen by scouts and sponsors now that they have been relegated to using local tracks.

81.    OKC and the Plaintiffs had a business relationship, and OKC is fully

aware of the ramifications of wrongfully evicting Plaintiffs from OKC less than one month away from the SKUSA races.

82.     OKC is aware of the negative ramifications of precluding racers from renting garages/toy hauler spots and being able to prepare karts at the OKC facility.

83.     As a result of Defendant's actions described above, Plaintiffs suffered irreparable loss and injury including, not limited to humiliation, embarrassment, emotional distress, and a deprivation of their rights to non-discrimination on the basis of Mr. Hamacher's disabilities, and from being a qualified companion to an individual with disabilities.

84.     Plaintiffs have suffered  significant  damages when OKC unjustifiably interfered with I.H.'s access to race at OKC based on discriminatory and malicious reasons.

85.     Plaintiffs made genuine attempts to rectify these legal issues, to allow I.H. to immediately get back to OKC, prior to filing this lawsuit.

## COUNT ONE
## VIOLATIONS OF TITLE III OF THE AMERICANS WITH DISABILITIES ACT ON BEHALF OF THOMAS HAMACHER AND I.H.

86.     Plaintiffs Thomas Hamacher and Iyairis Toledo  Fuentes *as parent of I.H,* repeat  and re-allege allegations ¶¶ 1-85 in support of their claims.

87.     Defendant is an entity covered by Title III of the ADA, 42 U.S.C. § § 12101, 12181 *et seq.*

88.     Defendant is a private entity that owns, leases, operates, and/or manages

a place of public accommodation, as defined by Title III of the ADA 42 U.S.C. § 12181(6) (7), 28 C.F.R. § 36.104.

89.    Title III of the Americans with Disabilities Act states that no person shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations by any person who owns or operates a place of public accommodation. 42 U.S.C. § 12182.

90.    Defendant denied Plaintiff Hamacher the opportunity to benefit from its services, facilities, privileges, advantages, and accommodations that were equal to that afforded to other individuals who are not disabled in violation of the prohibition against discrimination based on disability contained in Title III of the ADA. 42 U.S.C. § 12182, *et seq.*

91.    Defendant excluded and otherwise denied equal goods, services, facilities, privileges, advantages, accommodations, and other opportunities to I.H. because of  his known relationship and association with his disabled father. 42 U.S.C § 12182.

92.    Defendant intentionally failed to make reasonable modifications in its policies, practices, and/or procedures as necessary to afford Plaintiffs with its goods, services, facilities, privileges, advantages, and/or accommodations in violation of the prohibition against discrimination based on disability contained in Title III of the ADA. 42 U.S.C. § 12182, *et seq.*

93.    As a result of Defendant's actions described above, Plaintiffs suffered

irreparable loss and injury including, but not limited to, humiliation, embarrassment, emotional distress, and a deprivation of rights to non-discrimination on the basis of disability.

94.     In engaging in this unlawful conduct described above, Defendant acted maliciously to damage the rights and dignity of Plaintiffs.

**WHEREFORE**, Plaintiffs respectfully request the relief listed below:

## COUNT TWO
## VIOLATIONS OF THE FLORIDA CIVIL RIGHTS ACT
## ON BEHALF OF THOMAS HAMACHER

95.     Plaintiff Thomas Hamacher repeats and re-alleges allegations ¶¶ 1-85 in support of his claims.

96.     Plaintiff has complied with all legally required administrative prerequisites before filing this action. Plaintiff received a Determination of Reasonable Cause from the Florida Commission on Human Relations ("FCHR"), dated August 15, 2025, confirming satisfaction of the exhaustion requirement. According to the FCHR, the Defendant has received the same Notice.

97.     OKC is a place of public accommodation according to Florida Statute § §760.02 (11) (b) (c).

98.     All persons are entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation without discrimination or segregation on the ground of race, color, national origin, sex, pregnancy, handicap, familial status, or religion. Fla. Stat. §

760.08.

99.    Defendant violated the Florida Civil Rights Act by discriminating

against Mr. Hamacher with reckless disregard for his rights when they, knowingly and

brazenly, denied Mr. Hamacher accommodations based on his disabilities.

100.    As a result of Defendant's actions described above, Plaintiff Hamacher

has suffered irreparable loss and injury including, but not limited to, humiliation,

embarrassment, emotional distress, and a deprivation of his rights to non-

discrimination on the basis of disability.

**WHEREFORE**, Plaintiff respectfully requests the relief listed below:

**COUNT THREE**
**RETALIATION  IN VIOLATION OF THE ADA**
**ON BEHALF OF THOMAS HAMACHER AND I.H.**

101.    Plaintiffs Hamacher and Iyairis Toledo Fuentes *as parent of I.H.* repeats

 and re-alleges allegations  ¶¶ 1-85  in support of their claims.

102.    No person shall discriminate against any individual because such

individual has opposed any act or practice made unlawful by this chapter or because

such individual made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under this chapter.  42 U.S.C. § 12203, 28 C.F.R.

§ 36.206.

103.    It shall be unlawful to coerce, intimidate, threaten, or interfere with any

individual in the exercise or enjoyment of, or on account of his or her having exercised

or  enjoyed,  or  on  account  of  his  or  her  having  aided  or  encouraged  any  other

individual in the exercise or enjoyment of, any right granted or protected by this chapter. 42 U.S.C. § 12203.

104.    Defendant retaliated and coerced Mr. Hamacher and I.H. when denying them access to services, wrongfully evicting them from OKC and making verbal threats that if requests for accommodation do not cease I.H. would be prevented from racing at OKC.

105.    The adverse actions against Plaintiffs were taken in retaliation for continuing to request needed accommodations, and warning OKC of its violations of the anti-discrimination statutes.

106.    As a direct and proximate result of Defendant's continuous retaliation and discrimination on the basis of disability, Plaintiffs Hamacher and I.H.  suffered pecuniary damages, actual damages, nominal damages, and other non-pecuniary losses.

**WHEREFORE**, Plaintiffs respectfully request the relief listed below:

**COUNT FOUR**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**ON BEHALF OF THOMAS HAMACHER AND I.H.**

107.    Plaintiffs Hamacher and Iyairis Toledo Fuentes *as parent of I.H.* repeat And  re-allege allegations ¶¶ 1-85 in support of their claims.

108.    Defendant deliberately or recklessly inflicted mental suffering upon Plaintiffs. Defendant did so by denying Mr. Hamacher's reasonable accommodations after multiple requests and engaging in openly threatening and retaliatory behavior.

18

109.    Defendant deliberately or recklessly inflicted mental suffering upon a minor child I.H. when wrongfully evicting them from OKC with full knowledge of the effect that outrageous behavior would have on I.H.'s ability to race at the January 2025 SKUSA race, other races to follow and his racing career.

110.    Defendant deliberately or recklessly inflicted mental suffering upon Mr. Hamacher when targeting him as veteran with a disability and  using his request to be accommodated  as leverage to inflict emotional harm on I.H. and Mr. Hamacher.

111.    The conduct of the Defendant described herein was so outrageous it exceeds all bounds of decency and is utterly intolerable in a civilized community.

112.    The conduct of the Defendant was intended to and did cause Plaintiffs to suffer severe emotional distress, experience harassment, fear, embarrassment, lost professional opportunity and encounter prolonged degradation.

   **WHEREFORE**, Plaintiffs respectfully request the relief listed below:

## COUNT FIVE
## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONSHIP ON BEHALF OF ALL PLAINTIFFS

113.    All Plaintiffs repeat and re-allege allegations  ¶¶ 1-85 in support of their claims.

114.    OKC, and Andre Martin were aware of I.H.'s serious commitment to kart racing and was at OKC almost every weekend, which demonstrated that serious commitment.

115.    Bad Dog Racing was paying rent to OKC for a garage unit and a space

in the dirt lot so to effectuate I.H.'s ability to practice and engage in kart racing for four years.

116.    OKC and Andre Martin were aware that Bad Dog Racing was the entity used for I.H.'s racing effort and his fledgling racing career, and that I.H.'s parents spent significant funds through Bad Dog Racing to support I.H.'s racing career.

117.    Defendant was aware of the contract and business relationship Bad Dog Racing entered into so I.H. could race with the SODI team for the January 2025 SKUSA races at OKC.

118.    Defendant knew of Mr. Hamacher's disabilities and his need to be accommodated. OKC denied the accommodation requests.

119.    When in retaliation, Defendant unjustifiably terminated Bad Dog Racing's garage unit and dirt lot rental, it was an intentional and improper act precipitated on its frustration with Plaintiffs' continual request for accommodation.

120.    Defendant was aware that by wrongfully terminating the garage unit and dirt lot rental that I.H would not be able to practice or race at the location due to his father's disabilities.

121.    As a result of Defendant's actions, Plaintiffs suffered and continue to suffer actual damages, including, but not limited to, monetary damages, humiliation, mental anguish, emotional distress, embarrassment, shame, worry and frustration. These losses are either permanent or continuing and Plaintiffs will suffer these losses in the future.

122.    Plaintiffs suffered damage to their professional reputation, pecuniary losses, a path to a professional racing career, and loss of sponsorship opportunities.

**WHEREFORE**, Plaintiffs respectfully request the relief listed below:

**COUNT SIX**
**INTENTIONAL INTERFERENCE WITH**
**AN ADVANTAGEOUS BUSINESS RELATIONSHIP**
**ON BEHALF OF ALL PLAINTIFFS**

123.    All Plaintiffs repeat and re-allege allegations ¶¶ 1-85 in support of their claims.

124.    OKC, and Andre Martin were aware of I.H.'s serious commitment to kart racing and was at OKC almost every weekend which demonstrated that serious commitment.

125.    Bad Dog Racing was paying  rent to OKC for a garage unit and a space in the dirt lot so to  effectuate I.H.'s ability to practice and engage in kart racing for four years.

126.    OKC and Andre Martin were aware that Bad Dog Racing was the entity  used for  I.H.'s racing effort and his fledgling racing career, and that I.H. parents spent significant funds through Bad Dog Racing to support I.H.'s racing career.

127.    Defendant was aware of the contract and business relationship Bad Dog  Racing entered into so I.H. could race with the SODI team for the January 2025 SKUSA races at OKC.

128.    Defendant  knew of Mr. Hamacher's disabilities and his need to be accommodated. OKC denied the accommodation requests.

129.    When in retaliation,  Defendant unjustifiably terminated Bad Dog Racing Inc.'s garage unit and dirt lot rental, it was an intentional and improper act precipitated on its frustration with Plaintiffs continual request for accommodation.

130.    The only basis for such interference is overt and blatant discrimination against persons who have disabilities.

131.    Defendant was aware that by wrongfully terminating the  garage unit and dirt lot rental that I.H. would not be able to practice or race at the location due to his father's disabilities.

132.    As a result of Defendant's actions, Plaintiffs suffered and continue to suffer actual damages, including, but not limited to, monetary damages, humiliation, mental anguish, emotional distress, embarrassment, shame, worry and frustration. These losses are either permanent or continuing and Plaintiffs will suffer these losses in the future.

133.    Plaintiffs suffered damages, damage to their professional reputation, pecuniary losses, a path to a professional racing career, and  loss of sponsorship opportunities.

**WHEREFORE**, Plaintiffs respectfully request the relief listed below:

**COUNT SEVEN**
**WRONGFUL EVICTION**
**ON BEHALF OF ALL PLAINTIFFS**

134.    All Plaintiffs repeat and re-allege allegations  ¶¶ 1-85 in support of their claims.

135.    Plaintiff, Bad Dog Racing, as assignee and lessee, respectively, entered into an agreement with OKC for rental of grid side garage in December of 2023 and the dirt lot in March 2024.

136.    All Plaintiffs entered into possession of the premises and paid on a month-to-month basis and remained on the premises as a tenant during all of the times referred to in this Complaint.

137.    On or before December 26, 2024, while Plaintiffs were in peaceable possession of the premises as a tenant of OKC, Defendant, intending to injure Plaintiffs in their good name and reputation, and in order to cause all Plaintiffs to sustain great loss and damages, falsely, willfully, maliciously, without proper notice, and without any probable cause whatever, caused a distraint to be executed restraining Plaintiffs from entering both premises ( lot and garage) and operating their business on the premises.

138.    Defendant's acts have caused Plaintiffs to suffer great loss and injury to their reputation and credit, and sustained damages.

139.    In perpetrating the above acts, Defendant acted maliciously and wrongfully and with the intent, design, and purpose to injure Plaintiffs, Plaintiffs' good name and reputation. Accordingly, Plaintiffs requests exemplary and punitive damages against Defendant.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiffs request the following relief:

A.    The Court assume Jurisdiction;

B.      Grant Declaratory Relief on all claims;

C.      Grant Plaintiffs' injunctive relief from discrimination against Mr. Hamacher, a veteran with a disability and his companion I.H. in violation of the Americans with Disabilities Act;

D.      Find and hold that the Plaintiffs, Mr. Hamacher and I.H., have suffered from Defendant's acts of retaliation in violation of the Americans with Disabilities Act;

E.      For violations of the Florida Civil Rights Act, award Plaintiff, Thomas Hamacher, emotional distress, compensatory damages, punitive damages and or nominal damages in an amount to be determined at trial;

F.      Order Defendant to make its viewing mezzanines accessible to disabled patrons;

G.      Order Defendant to pay the Plaintiffs, Mr. Hamacher and I.H., economic damages, lost income, emotional distress, loss of enjoyment damages, and punitive damages for the malicious and/or reckless conduct described when it engaged in the intentional act of infliction of emotional distress, in amounts to be determined at trial;

H.      Grant Plaintiffs injunctive relief finding the Defendant engaged in Intentional Interference with Plaintiffs' contractual relationship and business relationship;

I.     Grant Plaintiffs injunctive relief finding Defendant engaged in Intentional Interference with Plaintiffs' Advantageous Business Relationship;

J.     Award compensatory, punitive damages and or nominal damages for the tortious inference in the Plaintiffs' Contractual and Advantageous Business Relationship;

K.     Grant general, actual, special and punitive damages, with interest, to Plaintiffs for the wrongful eviction from the dirt lot and the garage;

L.     Award reasonable attorneys' fees and expenses, including expert witness fees as allowed by law, all recoverable statutory costs, interest, and all litigation expenses not otherwise expressly allowed by statute; and

M.    Grant such other legal and/or equitable relief as the Court may deem just under the circumstances.

## **JURY DEMAND**

Plaintiffs demand trial by jury on all issues which can be heard by a jury.

Respectfully submitted this 2nd day of December 2025.

**MORGAN AND MORGAN**

*/s/ Sharon Caserta*
Sharon Caserta, Esq.
Florida Bar No.: 0023117
Morgan & Morgan
Deaf/Disability Rights
501 Riverside Avenue, Suite 1200
Jacksonville, FL 32202
(904) 361-0078 (Voice)
(904) 245-1121 (Videophone)
(904) 361-4305 (Facsimile)
scaserta@forthepeople.com
